
EOD
12/17/2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ENERGYTEC, INC., et al | § | CASE NO. 09-41477-btr11 |
| | § | (ADMINISTRATIVELY CONSOLIDATED) |
| Debtors. | § | |
| | § | |
| WICKFORD, INC. AND TCRG DRILLING & OPERATING, LLC, | § § | |
| | § | ADVERSARY NO 09-4202 |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| ENERGYTEC, INC. AND COMANCHE WELL SERVICE CORP., | § § | |
| | § | |
| DEFENDANTS. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiffs, Wickford, Inc. ("Wickford") and TCRG Drilling & Operating, LLC ("TCRG"), initiated this proceeding by filing an adversary complaint on November 18, 2009. The Court tried the complaint on an expedited basis, with the agreement of the parties, on December 8 and 9, 2009. At the conclusion of the trial, the Court took the matter under advisement. The following constitutes the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.

### I. FINDINGS OF FACT

### A. ENERGYTEC'S LEASES

1. Prior to December 23, 1999, Doyle Price, Sharon Price, Beverly Ringland, and Jolynne E. Kitchen collectively owned the minerals underlying the follow property:

> 160.00 acres of land, more or less, situated in the JOHN W. STEPHENS SURVEY A-529 and being the same land described in that certain deed from John Allen Aldridge, a single man to Jennie Belcher, dated April 16, 1951 and recorded in Volume 182,

> Page 65 of the Deed Records of Titus County, Texas and further described as:
>
> All of the John W. Stephens Survey, Abstract No. 529 and described as: Beginning at the Southwest corner of a survey made for James T. Smith, a stake in the North Boundary line of a 960 acre survey of J.F. Lund; THENCE West with Lund's North Boundary line 596 varas to the northwest corner of same in the E.B. line of E. A. Bowen Survey; THENCE North with said line 394 varas to a stake in the N.E. corner; THENCE West with Bowens North Boundary line 108 varas to a stake; THENCE North 950 varas to a stake in the S.B. line of a survey in the name of B. Struck; THENCE East 704 varas to the West Boundary line of the same survey; THENCE South with said line 394 varas passing another corner of same and Southwest corner of the J. T. Smith Survey at 1344 varas to the place of beginning and containing one hundred sixty (160) acres of land, more or less.

The foregoing real property is often referred to as the "Jennie Belcher" property, and the records of the Texas Railroad Commission refer to this property as the "Jennie Belcher Lease."

2.   In an oil and gas lease dated December 23, 1999, Doyle Price, Sharon Price, Beverly Ringland, and Jolynne E. Kitchen (hereafter the "Belcher Lessors") leased the minerals in the Jennie Belcher property to Frank W. Cole. The term of this lease was for two years, and for "as long thereafter as oil, gas, or other mineral" is produced therefrom.

3.   Prior to April 29, 2004, Doyle and Sharon Price collectively owned an undivided 50% of the minerals underlying the following property:

> 160.00 acres of land, more or less, situated in the JAMES T. SMITH SURVEY A-548 and being the same land described in that certain deed from W. C. Gray and wife, Janie Gray to Henry Garbade, dated August 9, 1935 and recorded in Volume 81, Page 560 of the Deed Records of Titus County, Texas.

The foregoing real property is often referred to as the "Garbade" property, and the records of the Texas Railroad Commission refer to this property as the "Adele Garbade Lease" (hereafter "Garbade Lease"). The balance of the minerals underlying the Garbade property are owned by a number of other individuals, who have generally been referred to as the Garbade Heirs.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 2**

4. In an oil and gas lease dated April 29, 2004, Doyle and Sharon Price leased their undivided half of the minerals in the Garbade property to Energytec, Inc. ("Energytec"). Paragraph 2 of this lease states that the term of this lease is for three years, and for "as long thereafter as oil, gas, or other mineral" is produced from the Garbade property. However, an amendment that was attached to, and made a part of, the lease at the time of execution. Paragraph 6 of the amendment modified the underlying lease's habendum clause as follows:

> If oil and/or gas is not produced in COMMERCIAL QUANTITIES after the expiration of the terms of the lease, this lease will become null and void. Commercial quantities will be construed as a production of two hundred (200) barrels in any ninety (90) day period. Any exception to this provision must be negotiated and agreed upon with the landowner in writing. Such provisions does [sic] not guarantee that an exception will be made.

5. During the first half of 2004, Energytec entered into oil and gas leases with some or all of the Garbade Heirs. These leases also covered the Garbade property. Energytec's leases with the Garbade Heirs uniformly provide for a three-year primary term, with the leases continuing "as long thereafter as oil, gas or other mineral is produced" from the Garbade property.

6. Through various assignments and transactions, Energytec succeeded to the interest of Frank W. Cole in the Jennie Belcher property and the Garbade property. Energytec hired or otherwise contracted with Comanche Well Service Corp. ("Comanche") to operate the Jennie Belcher Lease and the Garbade Lease.

**B. CESSATION OF PRODUCTION ON THE JENNIE BELCHER PROPERTY**

7. Production from the Jennie Belcher property ceased in March 2008 because the Texas Railroad Commission (the "RRC") issued a severance order to Comanche.

8. The severance order related to the allegedly improper techniques used to plug the Jennie Belcher 2L well. An employee of the RRC had previously approved the plugging

techniques used by Comanche. As a result of the confusion among staff at the RRC and resulting paperwork discrepancies, Defendants were unable to produce oil, gas or other minerals from the Jennie Belcher Lease from March 2008 until January 2009.

9. From March 2008 until early 2009, Defendants attempted to resolve the confusion at the RRC regarding the plugging of the Jennie Belcher 2L well. Although the Defendants could have appealed the severance order, there was no evidence that an appeal would have resolved the issue any sooner than January 2009. The Defendants' efforts to convince the RRC to lift the severance order were reasonable and, ultimately, successful.

10. The RRC finally lifted the severance order on January 20, 2009.

11. In the meantime, the RRC had issued another severance order for the Jennie Belcher Lease on January 16, 2009, based on production imbalances from 2008. Defendants received notice of this violation on or about December 17, 2008. Defendants did not file the forms necessary to resolve this issue with the RRC for more than three months after receiving notice of the problem. The RRC re-instated Defendants' authority to sell oil from the Jennie Belcher Lease on March 25, 2009.

12. Defendants resumed production from the Jennie Belcher property in August 2009.

### C. CESSATION OF PRODUCTION ON BOTH PROPERTIES

13. During 2008, a company called Bargas purchased crude oil from the Jennie Belcher and Garbade properties. Near the end of 2008, Bargas informed Defendants that it would cease purchasing crude from these properties at the end of 2008. Bargas stopped purchasing crude oil from these properties on December 31, 2008.

14. Rather than shut-in the Garbade Lease, Defendants began transporting oil from the Garbade property some 75 miles south to Kilgore so that it could be stored until Defendants made arrangements to have it sold. Pursuant to the royalty provisions of Energytec's lease of the

Garbade property from the Prices, a portion of the oil that was being hauled to Kilgore belonged to the Prices.

15. Mr. Price became concerned that his oil was being taken from his property and stored at a distant location without his being paid for it, and without any indication of when it would actually be sold. Mr. Price expressed his concerns about this issue to local representatives of Defendants. After several weeks of this practice, Mr. Price informed Defendants that he did not want them to haul oil off the Garbade property any more.

16. Mr. Price never told Defendants that they could not produce oil from the Garbade property. Mr. Price never told Defendants that they could not sell oil from the Garbade property. Mr. Price never threatened anyone with harm if they hauled oil off the Garbade property. Mr. Price never locked the gate to the Garbade property until arrangements could be made for the payment of unpaid royalties for the oil that had been hauled off the Garbade property.

17. On or about February 12, 2009, Defendants shut-in the Garbade property. Defendants subsequently learned that Wickford had taken leases from the Prices on the Jennie Belcher property and the Garbade property in April 2009. At that time, Pacer Energy Marketing, LLC, an affiliate of the company who was to become the debtor-in-possession lender, Red River Resources, Inc., purchased the oil from the Garbade property that had been stored at Kilgore. Pacer provided division orders to the Prices for the Jennie Belcher Lease on June 17, 2009 and for the Garbade Lease on August 25, 2009.

### D. WICKFORD'S LEASES

18. Energytec and Comanche filed voluntary Chapter 11 petitions on May 13, 2009.

19. Prior to the Defendants' bankruptcy, in April 2009, Wickford took oil and gas leases from the Belcher Lessors covering the Jennie Belcher property. In addition, in April 2009, Wickford also took an oil and gas lease from the Prices covering the Garbade property.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 5**

Wickford contracted with TCRG to be the operator of the Jennie Belcher Lease and the Garbade Lease.

20. In a Certificate of Compliance and Transportation Authority (Form P-4) dated May 14, 2009, TCRG applied to the RRC for authority to operate the Jennie Belcher Lease. However, in a letter dated July 29, 2009, Comanche informed the RRC that Energytec's lease or leases on the Jennie Belcher property were still in force and had become an asset of the bankruptcy estate, and Comanche requested that TCRG's application be dismissed. In a letter dated August 1, 2009, the RRC stated that it could not process TCRG's application for the reasons set forth in Comanche's letter, and that the RRC was therefore closing its file on TCRG's application.

21. In late August 2009, Defendants commenced production from two wells on the Jennie Belcher property and began to sell oil from the property. In September 2009, Defendants resumed production from two wells on the Garbade property and began to sell oil from the property.

## II. CONCLUSIONS OF LAW

22. This Court exercises its jurisdiction over this proceeding pursuant to 28 U.S.C §§ 157 & 1334. This is a core proceeding in which this Court may enter a final order pursuant to 28 U.S.C. § 157(b)(2)(A).

23. In its adversary complaint, Wickford asserts claims for trespass to try title to the minerals underlying the Jennie Belcher property and the Garbade property. Wickford also requests, among other things, a declaratory judgment that Energytec has no rights or interest in the disputed Jennie Belcher Lease and Garbade Lease.

24. Under Texas law, an oil and gas lease conveys a fee simple determinable estate in the oil and gas in place under the leased premises. *See Anadarko Petroleum Corp. v. Thompson,*

94 S.W.3d 550, 554 (Tex. 2002); *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982). The lessee obtains a possessory interest in the minerals, leaving the lessor with a royalty interest and a reversionary interest, which may ripen into a possessory interest if the oil and gas lease terminates. *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 9 (Tex. 2008).

25. The duration of a lessee's estate under an oil and gas lease is determined by the lease's habendum clause, which typically provides for a fixed period of time, called the "primary term," and an indefinite period, proscribed by the lease, called the "secondary term." *Anadarko Petroleum*, 94 S.W.3d at 554. The production necessary to maintain a lease under a habendum clause during the secondary term is generally described as "production in paying quantities." *Anadarko Petroleum*, 94 S.W.3d at 554. "Thus, a typical Texas lease that lasts 'as long as oil or gas is produced' automatically terminates if actual production in paying quantities ceases during the secondary term." *Id.*

26. In this case, the primary term of Energytec's lease on the Jennie Belcher property expired on December 23, 2001. *See Anadarko Petroleum*, 94 S.W.3d at 554. Thereafter, the lease was held in force by production in paying quantities. *Id.* Such production ceased in March 2008 as a result of confusion at the RRC in connection with the plugging of the Jennie Belcher 2L well.

27. Comanche acted in good faith, using techniques that had been approved by an apparently authorized employee of the RRC, in plugging the Jennie Belcher 2L well. Defendants did not cause and could not control the confusion at the RRC regarding their plugging techniques or the resulting severance order. The steps taken by Defendants to resolve the RRC's severance order were reasonable and reasonably prompt under the circumstances.

28. Energytec's lease on the Jennie Belcher property provides in pertinent part as follows:

> 0. If . . . the performance by Lessee of any covenant, agreement, or requirement hereof is delayed or interfered directly or indirectly by any past or future acts, orders, regulations, or requirements . . . of any state . . . or any agency . . . or authority of any [state], . . . <u>or on account of any other similar or dissimilar cause beyond the control of Lessee</u>, the period of such delay or interruption shall not be counted against the Lessee . . . .

Accordingly, the interruption to production caused by the severance order relating to the plugging of the Jennie Belcher 2L well is not held against Defendants. Defendants' interest in the minerals underlying the Jennie Belcher property did not terminate as a result of the cessation caused by the actions of the RRC.

29. However, the second severance order relating to production imbalances was within Defendants' control. Defendants waited more than three months to resolve the second severance order by submitting the proper forms to the RRC. After the RRC lifted the second severance order on March 25, 2009, Defendants waited approximately five more months to resume production on the Jennie Belcher property.

30. There were no other operations, events, or circumstances during or after January 2009 that would have perpetuated Energytec's lease. Accordingly, Energytec's lease on the Jennie Belcher property terminated for lack of production in paying quantities in March 2009. *See Anadarko Petroleum*, 94 S.W.3d at 554. Consequently, Energytec's interest in the minerals underlying the Jennie Belcher property reverted to the Belcher Lessors at that time. *See id.*

31. With respect to the Garbade property, Mr. Price's actions did not rise to the level of lessor repudiation, particularly since he never challenged Energytec's title at any meaningful

time.[1] *Adams v. Cannan*, 253 S.W.2d 948, 951 (Tex. Civ. App. -- San Antonio 1952, no writ). It was reasonable for Mr. Price to object to having his oil hauled off the property and stored at a distant location pending some inchoate future sale. A portion of this oil belonged to Mr. Price. It was his personal property, the removal of which without his permission arguably amounted to conversion. *See Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 817 (Tex. 1974).

32. Defendants shut-in the Garbade lease in February 2009. This cessation of production was due to the lack of a buyer – the storage tanks on site were full, and Mr. Price objected to the Defendants' transportation of oil from the Garbade property without making payment to him for his interest in the oil. Defendants did not resume production until September 2009, which was long after the expiration of the secondary term under the applicable habendum clause. There were no other operations, events, or circumstances during or after February 2009 that would have perpetuated Energytec's lease. Accordingly, Energytec's lease on the Garbade property terminated for lack of production in paying quantities in February 2009, *see Anadarko Petroleum*, 94 S.W.3d at 554, and Energytec's interest in the property reverted to the Prices and the Garbade Heirs. *See id.*

33. The oil and gas lease from the Belcher Lessors to Wickford resulted in the conveyance to Wickford of a fee simple determinable interest in the minerals underlying the Jennie Belcher property. *See Anadarko Petroleum Corp.*, 94 S.W.3d at 554; *Forderhause*, 641 S.W.2d at 525. Likewise, the oil and gas lease from the Prices to Wickford resulted in the conveyance to Wickford of a fee simple determinable interest in the minerals underlying the Garbade property. *Anadarko Petroleum Corp.*, 94 S.W.3d at 554; *Forderhause*, 641 S.W.2d at

---

[1] Lessor repudiation, being a form of equitable estoppel, is an affirmative defense that must be pleaded and proved. *Adams v. Cannan*, 253 S.W.2d 948, 951 (Tex. Civ. App.—San Antonio 1952, no writ); *BB Energy LP v. Devon Energy Production Co. LP*, 2008 WL 2164583, at *12 (N.D. Tex. May 23, 2008); *El Paso Production Co. v. Valence Operating Co.*, 112 S.W.3d 616, 622 (Tex. App.—Houston [1st. Dist.] 2003, pet. denied); *Mackay*, 695 F.2d at 855. Although Defendants did not plead lessor repudiation in this case, the Court addresses this affirmative defense in order to provide the parties with a full discussion of the arguments presented at trial.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 9**

525. Wickford, therefore, has standing to bring claims for trespass to try title as to Energytec's leases from the Garbade Heirs and anyone else from whom Energytec might claim an interest in either the Jennie Belcher property or the Garbade property. *Standard Oil Co. of Tex. v. Marshall*, 265 F.2d 46, 50 (5th Cir. 1959); *Roberson v. City of Austin*, 157 S.W.3d 130, 135 (Tex. App. -- Austin 2005, pet. denied).

34. The Court's order announced at a hearing in this matter on November 13, 2009, regarding an administrative expense and super priority lien in favor of Wickford, and an accounting for all oil produced and sold since Energytec's leases terminated, was retroactive to April 1, 2009. The Court will hold a separate hearing upon application by Wickford to determine the amount of any administrative expense claim (net of appropriate expenses) to be awarded to Wickford.

35. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of law. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. Likewise, to the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.

Signed on 12/17/2009

*Brenda T. Rhoades*  SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE